UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LORETTA CHAPA, | § | |
| | § | |
| Plaintiff, | § | Cv. No. SA:11-CV-00834-DAE |
| | § | |
| vs. | § | |
| | § | |
| WELLS FARGO, N.A., | § | |
| | § | |
| Defendant. | § | |
| | § | |

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

On February 10, 2014, the Court heard oral argument on the Motion for Summary Judgment filed by Defendant Wells Fargo, N.A. ("Wells Fargo"). (Dkt. # 48.)  Timothy M. Watson, Esq., appeared on behalf of Wells Fargo.  Ali Hakeem, Esq., and Carlos Uresti, Esq., appeared on behalf of Plaintiff Loretta Chapa ("Plaintiff").  After careful consideration of the memoranda in support of and in opposition to the Motion, and in light of the parties' arguments at the hearing, the Court, for the reasons that follow, **GRANTS** Wells Fargo's Motion for Summary Judgment (Dkt. # 48.)

<u>BACKGROUND</u>

I.    <u>Factual History</u>

Plaintiff began her employment in the Collections department of Wells Fargo in February 2009 as a non-supervisory employee.  ("Mot.," Dkt. # 48 at 4.)   In September 2009, Plaintiff was promoted to the Collections Supervisor I position.  (<u>Id.</u>)   During Plaintiff's employment as a Supervisor I, Plaintiff became aware of an open position for Supervisor II.  On or about April 11, 2010, Plaintiff nominated herself for the Supervisor II position through an internal promotion process referred to as a "Growth Promotion."[1]  ("FAC," Dkt. # 33 ¶ 7.)  Plaintiff notified her manager, Swantje Scott, about her self-nomination.  (<u>Id.</u>)  According to Plaintiff, at a meeting on or about April 20, 2010, Scott informed Plaintiff that she should expect to be promoted to the Supervisor II position within two to three months.  (<u>Id.</u>)  Scott advised that in order to obtain a promotion Plaintiff should (1) attend two formal training courses provided by Wells Fargo and read literature on management, (2) attempt to be a more "vocal leader" across the entire collections department, and (3) polish her "demeanor."  (<u>Id.</u>)

---

[1] Wells Fargo explains that there are two ways in which an employee may be promoted to the Supervisor II position.  First, there is a "growth promotion" in which an employee's manager could promote the employee if he/she believed that the employee was performing at the higher, Supervisor II, level.  (Mot. at 4.)  Second, any Supervisor I may apply for an open Supervisor II position which has been posted and is thus available for candidates to submit applications.  (<u>Id.</u>)

Approximately one week later, Plaintiff again met with Scott "to go over those suggestions and to seek clarification on how her demeanor needed polishing." (Id. ¶ 8.) During that meeting, Plaintiff alleges "Ms. Scott suggested that she be more vocal and that she needed to wear a skirt, specifically asking Plaintiff whether or not she would be willing to wear a skirt and be the cheerleader type with pom poms and a skirt walking up and down the aisles." (Id.)

On May 4, 2010, Plaintiff contacted the company liaison in human resources about Scott's comments, and the liaison recommended Plaintiff contact the Employee Relations Department. (Id. ¶ 9.) On May 24, 2010, Plaintiff met with Ryan Foxx, the Vice President of the Collections Department and Scott's immediate supervisor, to discuss the comments. (Id. ¶ 10.) At this meeting, Plaintiff expressed concern over the "lack of any clear feedback towards attaining the Supervisor II position," and Foxx told Plaintiff he would help "define clear objectives for the promotion" and he also "would contact the appropriate people to deal with the inappropriate comments [made by Scott] and someone would be in contact with [Plaintiff] within a week or two." (Id.) Plaintiff asserts she received no calls or meetings regarding the meeting she had with Foxx. [2] (Id. ¶ 11.)

---

[2] Although she asserts that she never received a follow-up with Foxx, Plaintiff later in the complaint asserts that she met with Foxx again on or about August 30, 2010. (FAC ¶ 14.)

On or about June 7, 2010, Plaintiff alleges she "started feeling more uncomfortable in the work environment as acts of retaliation became more obvious in meetings and interactions with Ms. Scott." (Id.) Plaintiff asserts Scott made comments to her such as "believe in karma," "what goes around comes around," and "keep your friends close and your enemies closer." (Id.) Specifically, Plaintiff alleges Scott stated that "she would never want someone to report her to human resources." (Id.)

After a meeting on August 23, 2010, Plaintiff alleges Scott apologized for her "skirt" comments and also expressed to Plaintiff that she was offended Plaintiff had complained to Foxx, her supervisor. (Id. ¶ 12.) Plaintiff asserts that at the end of this "heart-to-heart," Scott acknowledged that Plaintiff had "earned the promotion to a Supervisor II position, and that the promotion would occur sometime in September." (Id.) At the end of August, Plaintiff "formally applied" for the Supervisor II position that had been posted. (Id. ¶ 13.)

On or about August 31, Plaintiff met with Scott to discuss and review her "Performance Appraisal." (Id. ¶ 15.) Plaintiff asserts that Scott presented her with a document entitled "Career Path to Collections Supervisor II" that contained "newly set out criteria" in order to obtain a promotion. (Id.) Plaintiff asserts Scott told her that they could not move forward with Plaintiff's promotion to Supervisor II and that she would instead need to excel in all of the areas listed in the document

4

on a consistent basis for a year before she could be promoted through the growth promotion process.  (Id.)  Plaintiff asserts that she met with other employees to discuss whether they had seen this "newly set out criteria," and they confirmed that they had not.  (Id.)

Plaintiff thereafter spoke with Julie Methley, the Employee Relations liaison, and asked to be reconsidered for the position and informed Methley that she felt she was being held to a "higher standard than even the current Supervisor II employees and that she did not understand the reasoning behind this."  (Id. ¶ 16.) Plaintiff contacted Methley again because "she felt like she was being retaliated against by not being given an opportunity to be considered for the Supervisor II position."  (Id. ¶ 17.)  Plaintiff received a reply from Methley stating that her complaint regarding Scott's "skirt" comments could not be substantiated and that after discussing the matter with Scott, it was apparent there must have been a misunderstanding as to the "skirt comment."  (Id.)  Methley also explained to Plaintiff that the adoption of the "Career Path to Collections Supervisor II" criteria was management's decision.

In September of 2010, Plaintiff was re-assigned to a different Collections team under the direction of Matt Trombley.  (Id. ¶ 18.)  On or about October 12, 2010, Plaintiff received formal notice that she was not selected for the

Supervisor II position.  (Id. ¶ 21.)  Plaintiff learned that Harold Chambers, an

African-American, was hired for the position.

Plaintiff alleges her employment with Wells Fargo became more

stressful in the ensuing months.  On December 22, 2010, a co-worker informed

Plaintiff that Scott had "dismissively stated to [the co-worker] that there was no

such supervisor as Loretta Chapa and that she did not even know whom [sic]

Loretta Chapa was."  (Id. ¶ 28.)  Plaintiff reported this issue to Trombley and Foxx,

who later contacted Plaintiff and told her that they had looked into her complaints

and Scott's alleged comments about not knowing who Plaintiff was "were not

corroborated by the parties they spoke with."  (Id. ¶ 32.)

On or about January 17, 2011, Plaintiff applied for another Supervisor

II position in a different department where she alleges there were three openings.

(Id. ¶ 38.)  On January 25, 2011, Plaintiff interviewed for the Supervisor II position

and on February 2, 2011, she received a rejection notice for the position stating

"there were other candidates whose qualifications more closely matched the

requirements for the position."  (Id. ¶ 41.)

Plaintiff eventually took a medical leave of absence starting on March

7, 2011.  (Id. ¶ 46.)  On July 11, 2011, Plaintiff submitted her letter of resignation

to Wells Fargo based upon "undue stress and the Plaintiff's inability to return to

work in a hostile environment where she had become completely alienated." (Id. ¶ 47.)

## II.   Procedural History

In October of 2010, Plaintiff filed a complaint with the EEOC. (FAC ¶ 22.) On July 14, 2011, the EEOC sent Plaintiff a letter informing her of her right to sue. (Id. ¶ 48.)

On October 11, 2011, Plaintiff filed suit against Wells Fargo asserting Title VII claims for discrimination on the basis of sex and race, retaliation, and constructive discharge. Plaintiff filed her First Amended Complaint ("FAC") on November 7, 2012. (Dkt. # 33.) On April 5, 2013, Wells Fargo filed its Motion for Summary Judgment. ("Mot.," Dkt. # 48.) Plaintiff filed her Response to Wells Fargo's Motion on May 5, 2013 ("Resp.," Dkt. # 51), and Wells Fargo filed a reply on June 6, 2013. ("Reply," Dkt. # 55.) Defendant's Motion for Summary Judgment is now before the Court.

## STANDARD OF REVIEW

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). The main purpose of summary judgment is to dispose of

factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

323–24 (1986).

The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact.  <u>Id.</u> at 323.  If the moving party

meets this burden, the non-moving party must come forward with specific facts

that establish the existence of a genuine issue for trial.  <u>ACE Am. Ins. Co. v.</u>

<u>Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th Cir. 2012).  In

deciding whether a fact issue exists, "the court must draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133,

150 (2000).  However, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary

judgment."  <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th Cir. 2003).  "Where

the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'"  <u>Matsuhita Elec. Indus.</u>

<u>Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l</u>

<u>Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

<u>DISCUSSION</u>

Wells Fargo argues that this Court should grant summary judgment in

its favor on all of Plaintiff's claims because Plaintiff (1) cannot demonstrate a

8

prima facie case of discrimination, (2) cannot prove that Wells Fargo's legitimate, nondiscriminatory reasons for not promoting her are pretexual, (3) cannot demonstrate any causal connection between her alleged complaint of discrimination and Wells Fargo's decision not to promote her, and (4) cannot allege any conduct by Wells Fargo that reaches the standard required for a constructive discharge claim.  (Mot. at 1–3.)

I.    Title VII Discrimination

A Title VII plaintiff bears the burden of establishing a prima facie case of discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  To establish a prima facie case of a discriminatory failure to promote, the Plaintiff must show:  (1) she is a member of a protected group; (2) she was qualified for the position; (3) she was not promoted; and (4) the position was filled by someone outside the protected class.  McDonald v. Entergy Operations, Inc, 75 F. App'x  279 (5th Cir. 2003).

If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action.  Grice v. FMC Tech., Inc., 216 F. App'x 401, 406 (5th Cir. 2007) ("The employer's burden is only one of production, not persuasion, and involves no credibility assessment.")  If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's legitimate,

nondiscriminatory reason is pretext for discrimination.  Id.  "To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer."  Id. (citing Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003).  "The plaintiff must substantiate his claim of pretext through 'evidence demonstrating that discrimination lay at the heart of the employer's decision' or that the asserted justification is false."  Franklin v. Boeing, Co., 232 F. App'x 408, 410 (2007) (quoting Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002)).

"Any issue of pretext 'merges with the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination.'" Bienkowski v. Am. Airlines, Inc., 851 F.2d 1053 (5th Cir. 1988) (quoting Tex. Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).  Because the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated is on the plaintiff, the plaintiff must produce substantial evidence of pretext in order to survive summary judgment.  See Auguster v. Vermission Parish Sch. Bd., 249 F.3d 400, 402–03 (5th Cir. 2001); Rideout v. Allstate Ins. Co., No. 2:11CV222, 2013 WL 6061330, at *5 (N.D. Miss. Nov. 18, 2013) (noting a plaintiff must "present 'substantial evidence' that the employer's proffered reason is a pretext for discrimination" (quoting Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2008))).

A.      Plaintiff has Demonstrated a Prima Facie Case of Discrimination

Wells Fargo first asserts that Plaintiff has failed to demonstrate a prima facie case of race or gender discrimination because she was not qualified for the Supervisor II position under either the growth promotion or the criteria for the posted Supervisor II position for which she applied.  (Mot. at 5.)  Plaintiff responds that she has demonstrated a prima facie case of discrimination and that evidence "clearly contradicts" Wells Fargo's argument that she was not qualified for the position of Supervisor II.  (Resp. at 1.)

Wells Fargo asserts that interpersonal and communication skills are "basic qualifications" for the Supervisor II position.[3]  (Mot. at 7.)  Wells Fargo attached the deposition of Ryan Foxx, the Vice President of Collections during Plaintiff's employment, to discuss the Supervisor I and II positions.  (Id. Ex. D-2.) Foxx testified that the difference between a Supervisor I and a Supervisor II is an

---

[3] Curiously, Wells Fargo did not attach a specific job description of the Supervisor II position to its Motion.  Plaintiff, however, attached to her Response an Internal Posting for Collections Supervisor II.  (Dkt. # 51-3 Ex. E.)  It provides that the "job description" for a Supervisor II is as follows: Responsible for the day-to-day operations of a team of collectors and may oversee first-level supervisors.  Duties may include: supervising workflow and quality of collections activity; working with management team to identify problems and improve collections efforts; communicating company and unit policy, procedures, and practices; making employment decisions and setting performance standards; training and coaching staff; writing and conducting performance evaluations; performing budgetary, product and/or business case analysis; researching/analyzing special projects as assigned.

increase in responsibility rather than scope.  (Id. Ex. D-2 at 15:3-7.)  Foxx stated

that "scope" means the "level at which someone manages."  (Id. at 13:6.)  He

stated, "scope could mean today I manage individual contributors, a change in

scope may be that I now manage managers, a change in scope could also be that

today I manage 10 people and tomorrow I manage 50 people" (Id. at 13:7-11.)

Foxx also stated that an employee could have an increase in responsibility, but not

have an increase in scope.  (Id. at 13:12-17.)  Foxx testified:

> Q:   Okay . . . In terms of supervisor 1s versus supervisor 2s, is that
> an increase in scope or an increase in responsibility?
>
> A:   I think part of that would be an increase in responsibility.

(Id. 15:3-7.)  Those increases in responsibilities, Foxx stated, "may be projects, it

may be peer-to-peer coaching, it may be additional leadership responsibilities," (Id.

13:22-25), and those responsibilities "do not require any particular knowledge, but

rather are skills that are "more leadership, behavioral based, that would allow them

to do more responsibilities."  (Id. at 65:11-21.)

Scott, the Collections Manager at Wells Fargo, testified that when

considering promoting someone from Supervisor I to Supervisor II she "look[s] for

people that can influence their peers, that have a more broad perspective on

managing our business, and who can also partner with their peers, coach and

develop their people, drive for results."  (Id. Ex. D-3 at 64:8-12.)  Scott testified in

her deposition that Plaintiff "was not a positive motivator, she did not partner with her peers, she managed her team solo versus the department holistically."  (Id. at 17:3-5.)

Wells Fargo attached a Summary of Facts in Support of their Motion to demonstrate Plaintiff's "history of interpersonal and communication issues" and, thus, illustrate how she was not qualified for the position of Supervisor II.  (Mot. Ex. 2.)  The Summary of Facts demonstrates that prior to her employment with Wells Fargo, Plaintiff received a "Final Warning" at her previous employer:

> Verbal disrespect in tone and manner of answering calls from higher management where subordinates can overhear is an act of disrespect of higher management and it is to be corrected immediately.  Failure to immediately correct these problems will result in termination.

(Mot. Ex. D-1, Ex. 14.)  At a different previous employer, Plaintiff was told:

> An area for improvement, that I will be monitoring, is your occasional tendency to be harsh and have a sarcastic undertone in the verbal correction of your subordinates . . . This tactic only causes your colleagues and subordinates to harbor feelings of resentment."

(Id. Ex. D-1, Ex. 15.)

Wells Fargo asserts that the Summary of Facts and other exhibits attached to its Motion demonstrate Plaintiff's "poor interpersonal skills/communication style" and, thus, demonstrates that she was not qualified for the position of Supervisor II.  (Id. Ex. 1 at 2.)  Wells Fargo points out that Plaintiff

was "counseled" for her poor interpersonal skills/communication style while employed at Wells Fargo:

November 2009:  In their one-on-one meeting, Scott advised Plaintiff to "focus building rapport with your peers." (Id. Ex. 1 at 3.) (Id. Ex. B-3.)

December 2009:  In her first year-end performance review with Wells Fargo, only three months after she began reporting to Scott, Scott provided feedback to Plaintiff stating: "I challenge you to begin taking a leadership role amongst your peer and become more involved in the department, in addition to leading your team to exceed goals.  Focus on interacting and engaging in a positive manner at all times.  Your delivery style will be key component [sic] to your success in 2010."  (Id. Ex. 1 at 3.) (Id. Ex. B-1 at 8.)

April 20, 2010: In Scott's feedback regarding Plaintiff's interest in a promotion to Supervisor II, Scott suggested that Plaintiff focus on the area of "Transition from Managing to Leading People" and instructed Plaintiff to keep her updated on attaining a "[l]eadership role amongst your peers through driving innovative changes within our department; providing peer to peer coaching/feedback."  (Id. Ex. B-5.)  Also in Scott's feedback, Scott instructed Plaintiff to focus on "Department Engagement (Perception)" by focusing on "[p]ositive interactions/communication style (Always know your audience)."  (Id.)

14

April 28, 2010: An email was sent from Plaintiff to Scott explaining

an incident that occurred with another employee. In the email, Plaintiff writes:

> I just got off the phone with Roy Rico and we had a very good conversation.  I sincerely apologized to him and he accepted my apology.  I explained to him that Carrie had misrepresented the situation to me and that I was also used to dealing with very difficult escalated calls.
>
> He apologized to me too and said that he felt bad and that he thinks he was out of line too.  He said he was frustrated because it was the end of month [sic] & they were busy.  He also said that he overreacted to what I said and that it was just miscommunication between he and I.
>      . . . .
> I learned a great deal from this experience and <u>I assure you that I will be more objective going forward, more patient and more cognizant of who I am speaking to and how what I say could be perceived.  I appreciate you working with me on this issue</u> and I will certainly learn and grow from it.

(<u>Id.</u> Ex. B-6 (emphasis added.))

May 16, 2010:  After a one-on-one meeting, Scott emailed Plaintiff

the following:

> Per our 1on1 5/4/2010, to ensure our expectations are clear as it related to your interaction with our borrowers, 3rd party agents, team members, etc. We are expected to represent Wells Fargo in a professional and respectful manner at all time.  <u>It is unacceptable to be rude with handing borrowers, team members, 3rd Party, etc.</u>  We have zero tolerance for rude, condescending or disrespectful interactions when representing Wells Fargo and servicing calls.

(<u>Id.</u> Ex. B-7. (emphasis added))

15

May 24, 2010:  After a customer contacted Elizabeth Aleman, a manager at Wells Fargo, to make a complaint regarding Plaintiff's conduct, Aleman sent an email regarding the incident to Scott:

> I spoke with [Plaintiff] on 5/24/2010 and played the call from Yvonne Correa at Helping Homeowners Succeed.
>
> [Plaintiff] initially seemed caught off guard and was curious as to how I was made aware of the call.
>
> I explained how the 3rd party contacted us to share her concerns.  Once I explained that this call was prior to your discussion with her regarding her tone with customers on escalated calls she was more receptive to the feedback.
>
> She discussed how she is working on correcting this type of behavior and that we should not hear any further calls from her that get elevated.

(Id. Ex. B-8.)

June 2, 2010:  In an email following a meeting, Scott wrote to Plaintiff regarding her interest in a promotion to Supervisor II:

> Discussed providing open honest feedback to peers; One stop resolution with peers.
>
> Suggest completed Coaching for Premiere Performance and Crucial Conversation WF training classes to improve communication/coaching style.
>
> Continue focusing on your communication style with our borrowers/customer to ensure your action plan to improve provides results.

(Id. Ex. B-9.)

After evaluating the evidence, the Court concludes that Plaintiff has established a prima facie case of Title VII discrimination.  Wells Fargo has not met

is burden of establishing, as a matter of law, that Plaintiff was not qualified for the position of Supervisor II.  See Burdine, 450 U.S. at 253 ("The burden of establishing a prima facie case of disparate treatment is not onerous.")  While Plaintiff may have not been preferred for the position due to her lack of "interpersonal and communication skills," the evidence does not demonstrate that she was not qualified for the position under any circumstances.  Therefore, the Court concludes that Plaintiff has made a prima facie case of discrimination.

However, based on the above mentioned evidence, the Court concludes that Wells Fargo has proffered a legitimate, nondiscriminatory reason for declining to promote Plaintiff based on her lack of interpersonal and communication skills.  The evidence demonstrates that Scott felt that strong interpersonal and communication skills were essential to a Supervisor II position. Scott stated that when considering promoting someone from Supervisor I to Supervisor II she looks "for people that can influence their peers," and "have a more broad perspective on managing our business, and who can also partner with their peers, coach and develop their people, drive for results."  (Mot. Ex. D-3 64:8-12).  Scott stated she felt that Plaintiff "was not a positive motivator," "did not partner with her peers," and "managed her team solo versus the department holistically."  (Id. at 17:3-5.)  Additionally, Foxx stated in his deposition that based on his conversations with other managers, Plaintiff was not granted a promotion

17

because of "some of [her] leadership behaviors, particularly around some of the communication with peers." (Mot. D-2 at 58:1-6.) Accordingly, the Court concludes that Wells Fargo has proffered a legitimate, nondiscriminatory reason for declining to promote Plaintiff; thus, the burden shifts back to Plaintiff to show that reason is pretext for discrimination.

      B.     <u>Plaintiff Cannot Show Wells Fargo's Legitimate, Nondiscriminatory Reason is Pretext for Race/Gender Discrimination</u>

      Wells Fargo argues that it even if Plaintiff has established a prima facie case of discrimination, it is entitled to summary judgment because Plaintiff cannot show Wells Fargo's reasons were merely pretext for discrimination.

      To satisfy his burden on pretext, a plaintiff may either show that a discriminatory reason more likely motivated the employer, or that the employer's proffered explanation is "unworthy of credence." <u>Waggoner v. City of Garland</u>, 987 F.2d 1160, 1164 (5th Cir. 1993). "Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." <u>LeMarie v. Louisiana Dept. of Transp. & Dev.</u>, 480 F.3d 383, 391 (5th Cir. 2007). Rather, Plaintiff must show that Wells Fargo's proffered non-discriminatory reason for declining to promote Plaintiff was pretext <u>for race and/or gender discrimination</u>. See <u>Waggoner</u>, 987 F.2d 1160, 1164 (emphasis added); <u>Hazen Paper Co. v.</u>

Biggins, 507 U.S. 604, 610 (1993) ("[L]iability depends on whether the protected trait [] actually motivated the employer's decision.").

Importantly, employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions, nor [are they] intended to transform the courts into personnel managers." Bienkowski, at 1507–08.   Therefore, a necessary element of proof in any employment discrimination claim is a showing that an employer intentionally discriminated against an employee because of that employee's protected status. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 141 (2000) (emphasis added).  That requires a showing, in Plaintiff's case, of racial or gender motivation, or both, behind the failure to promote her.  Id.

Plaintiff dedicates the majority of her argument and attached exhibits to arguing that Wells Fargo's proffered reason that she had poor interpersonal/communication skills is "clearly false" and "unworthy of credence." (Resp. at 4, 12.)   Plaintiff argues, "her job performance was exceptional."  (Id.) Plaintiff alleges that Wells Fargo's records have been mischaracterized to show she was "rude and needlessly confrontational with customers and fellow employees" resulting in complaints against her.  Specifically, she asserts that there was only one actual "complaint" and the rest of the instances Wells Fargo refers to in its Summary of Facts were one-on-one meetings which were regularly held with her

manager.  Id.  She also asserts that in regards to the complaint made against her,
"the complaint was not serious enough for [her] actual supervisor, Ms. Scott, to
discuss."  Id.  Plaintiff refers to "countless emails expressing gratitude for her work
and for her contribution to other team members" (Id. at 5) and asserts that
"[d]uring her tenure with Wells Fargo, her team, one of ten in the department,
consistently placed at the top or near the top in terms of performance."  (Id. at 6.)

  However, "[s]imply disputing the underlying facts of an employer's
decision is not sufficient to create an issue of pretext."  LeMarie, 480 F.3d at 391.
Rather, Plaintiff must create a genuine issue of material fact on whether Wells
Fargo's proffered reason is really pretext for discrimination against her on the basis
of race and/or gender.  Id.  "[U]nder the [Title VII] framework, '[t]he ultimate
burden of persuading the trier of fact that the defendant intentionally discriminated
against the plaintiff remains at all times with the plaintiff.'"  Reeves, 530 U.S. at
143 (quoting Burdine, 450 U.S. at 253).

  1. <u>Plaintiff Has Not Created A Genuine Issue of Material Fact on
    Whether Wells Fargo's Reason Is Pretext For Race Discrimination</u>

  The only assertion Plaintiff makes regarding discrimination against
her on the basis of race is her assertion that Scott, who hired Chambers (an
African-American), gave preferential treatment to African-Americans.  (Resp. at
7.)  Plaintiff argues that, "[p]articularly, African-Americans were given time off

and leave from work under much more relaxed circumstances than others, and there was a feeling that Ms. Scott was playing favorites." (Id.)   Further, Plaintiff asserts, "at one point Ms. Scott had selected only African-Americans to be direct reports to her." (Id.)

Wells Fargo, in its Reply, responds that Plaintiff's assertion that Scott only selected African-Americans to report to her is false. (Reply at 6 n.8.)  In support, Wells Fargo attached their answers to interrogatories as an exhibit which shows that from the time that Plaintiff started working for Wells Fargo (October 2009) until the time that Wells Fargo submitted its Interrogatory Answers in this case on January 24, 2013, Scott hired and/or promoted nine direct reports. (Id.  Ex. 1).  Of these nine people four were Hispanic, three were African-American, one was Native American, and one was Caucasian. (Id.)  Scott also stated in her affidavit that she interviewed two Hispanic females when she interviewed Chambers. (Mot. at Ex. C.)

Additionally, Wells Fargo asserts that race did not play a role in the decision to hire Chambers because he was better qualified than Plaintiff. (Mot. at 9–10.)  Wells Fargo provided evidence that Chambers had previous experience as a Supervisor II with Defendant in Delaware prior to being laid off due to a reduction in force. (Id. at Ex. B)  While employed as a Supervisor II, Chambers received a "Superior" performance rating in his last annual review. (Id.)   Therefore, Wells

21

Fargo asserts, he was seeking a lateral move rather than a promotion and had "an established track record" in the Supervisor II position.  (Id. at 10.)

Plaintiff argues that although Chambers had previously served as a Supervisor II, he came from a different department and geographical location while she was already within the hiring department and was performing at "a high level."  (Resp. at 12.)  Plaintiff fails, however, to demonstrate how the fact that she was already placed within the department, as opposed to coming from a different geographical area, renders her more qualified for the position than Chambers. (Id.)

Further, Wells Fargo asserts that Chambers was given preference pursuant to Wells Fargo's "Retain Policy," in which hiring managers are expected to, whenever possible, retain qualified employees whose positions have been eliminated.  (Mot. at 15.)  Although Chambers had recently been laid off, he was still a Wells Fargo employee and was still receiving a salary from the company.  (Id.)  When a displaced employee applies for a position, their displaced status is flagged in Wells Fargo's systems so hiring managers are made aware of which employees that apply have had their positions eliminated.  (Id.)  Scott affirmed that she is aware of Wells Fargo's Retain Policy and that Chambers' situation is one in which the retain policy applies.  (Mot. at Ex. C.)

Other than her subjective belief that Scott treated African-Americans more favorably, Plaintiff presents no evidence that Wells Fargo discriminated

against her on the basis of her race.  Moreover, a plaintiff must produce substantial

evidence of pretext in order to survive summary judgment.  <u>Auguster</u>, 249 F.3d at

402–03.  Plaintiff has not met her ultimate burden of persuasion that the defendant

intentionally discriminated against her and has not demonstrated a genuine issue of

material fact exists as to whether Wells Fargo's proffered reason is pretextual.

Accordingly, the Court grants Wells Fargo's Motion for Summary Judgment on

Plaintiff's Title VII race discrimination claim.

> 2. <u>Plaintiff Has Not Created A Genuine Issue of Material Fact on Whether Wells Fargo's Reason Is Pretext For Gender Discrimination</u>

Plaintiff also asserts that Wells Fargo discriminated against her on the

basis of gender.  The only incident Plaintiff asserts evidences gender

discrimination is the alleged "skirt" comment made by Scott.   Plaintiff alleges that

"Ms. Scott suggested that she be more vocal and that she needed to wear a skirt,

specifically asking Plaintiff whether or not she would be willing to wear a skirt and

be the cheerleader type with pom poms and a skirt walking up and down the

aisles."  (FAC  ¶ 8.)  In her deposition, Plaintiff recounted her recollection of the

skirt comment that she put into writing with the EEOC:

> Q:  And [the EEOC letter] goes on to talk about how you asked her
> again about this demeanor needing to be polished.  It says, she then
> asked me if I would be willing to come to work in a skirt.  And I said,
> excuse me?  And she said, would you be willing to be the cheerleader
> type with pom poms and a skirt walking up and down the aisles.  I

said that I already inspire, encourage and motivate people.  She said, no, if I told you that you needed to wear a skirt, would you do it?  I'm trying to think of the one thing that would make you feel the most uncomfortable, and I think it's wearing a skirt.  Am I right?

And I said that I – and I said yes.  I said that I'm a team player but I didn't think I needed to change who I am, that I don't really want to.  She then said, so what if I said that in order to move up and manage managers you had to wear a skirt?  I said that I'm a genuine and modest person and that I didn't want to be fake and people don't want me to be fake.  She said that sometimes you have to be fake and do things that make you feel uncomfortable to play the game if you want to get ahead.  During this conversation she mentioned having to wear skirts to get a promotion five or six times.

(Ex. D-1 37:4-38:2.)

Wells Fargo attached the deposition of Scott, in which Scott explains her recollection of the conversation.  Scott stated she does not recall using the word "skirt," and explained that she recalled telling Plaintiff that she needed to be "positive and a positive motivator on the floor" with the department.  (See Mot. Ex. D-3 21:7-22:2.)  When asked about the "cheerleading" analogy, Scott stated that she and Plaintiff "were talking about being positive and being motivating to people, and that was the analogy – analogy that I used," specifically, "[c]heering people on, motivating them, pats on the back, high fives."  (Id. at 24:2-7.)

Wells Fargo asserts that Plaintiff could not reasonably believe that she was required to wear a skirt as the employees in the Collections department, including both Scott and Plaintiff, wore very informal attire and typically wore

jeans or pants.  (Mot. at 15.)  In her deposition, Plaintiff also agreed that employees mostly wore pants in the Collections department.  (Id. Ex. D-1 43:7-44:16.)

Accepting Plaintiff's recollections of the comments as true, it is evident that an analogy (albeit, a poor one) was being made to being a "cheerleader" for a team and motivating people in a supervisory capacity and "be willing to be the cheerleader type with pom poms and a skirt walking up and down the aisles."  (See id. Ex. D-1 37:4-38:2.)  Indeed, Methley, the Employee Relations liason, told Plaintiff that after an investigation, her complaint regarding Scott's "skirt" comments could not be substantiated and that after discussing the matter with Scott, it was apparent there must have been a misunderstanding.  (FAC ¶ 17.)

Plaintiff's gender discrimination claim is predicated only on her assertion that she believed Scott told her she must wear a skirt in order to be promoted.  Clearly, however, Plaintiff did not also believe she was required to use "pom poms" or wear a cheerleading uniform in order to get promoted.  Without more, Plaintiff fails to raise a genuine issue of material fact that she was discriminated against on the basis of her gender simply because of the "skirt" comment.  As mentioned above, Plaintiff offers no additional evidence of gender discrimination. Accordingly, the Court grants Wells Fargo's Motion for Summary Judgment on Plaintiff's Title VII gender discrimination claim.

II.   <u>Title VII Retaliation</u>

A plaintiff may establish a prima facie case of unlawful retaliation by demonstrating:  1) she engaged in a protected activity, 2) she suffered an adverse employment decision, and 3) a causal link exists between the activity and the adverse employment decision.  <u>Medina v. Ramsey Steel Co., Inc</u>, 238 F.3d 674, 684 (5th Cir. 2001).  If a prima facie case is established, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its actions.  <u>Burlington N. & Santa Fe Rwy. Co. v. White</u>, 548 U.S. 53, 68 (2006).  If defendant meets this burden, the burden shifts back to plaintiff who has the ultimate burden of showing that the reasons given are mere pretext for retaliation.

The Fifth Circuit has "consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated."  <u>Septimus v. Univ. of Hous.</u>, 399 F.3d 601, 608 (5th Cir. 2005); <u>see</u> <u>Hernandez v. Yellow Transp., Inc.</u>, 670 F.3d 644 (5th Cir. 2012). Therefore, to show a defendant's reasons were mere pretext for unlawful retaliation, a plaintiff must ultimately show that but for the protected activity, the adverse employment action would not have occurred.  <u>Gollas v. Univ. of Tex. Health Science Ctr. at Hous.</u>, 425 F' Appx. 318, 321–22, 324 (5th Cir. 2011) (noting that "but for" causation requires a showing that the

protected activity was the "sole motivating factor for the adverse employment action").

To survive summary judgment, the "but for" causation standard requires a plaintiff to demonstrate "a conflict in substantial evidence on the ultimate issue of retaliation." Id. at 327. "Under this 'but for' causation standard, '[e]ven if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct.'" Id. (citing Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996)). Thus, in Plaintiff's case, no liability for unlawful relation arises is she would not have been promoted even in the absence of the protected conduct. See id.

Plaintiff asserts that both Scott and Trombley declined to promote her, and their failure to do so was motivated by retaliation for Plaintiff's complaint regarding Scott and the "skirt" comment that she reported. Specifically, Plaintiff asserts that Scott retaliated against her by denying her either a growth promotion or a promotion through the posted position; she claims that Trombley retaliated against her by filling out an internal reference form stating that he would not rehire her.

Wells Fargo argues that Plaintiff cannot show that its reasons for not promoting her were pretextual. (Mot. at 16.) Specifically, Wells Fargo argues that

27

Plaintiff cannot show that her protected activity is the "but for" cause of her not being promoted by either Scott of Trombley.  (Id.)

A.    Retaliation by Scott

Wells Fargo asserts that Plaintiff cannot show retaliation because Scott had decided that Plaintiff's interpersonal skills needed improvement before she could be promoted prior to Plaintiff's complaint about Scott and the alleged "skirt" comment.  (Mot. at 17.)  Further, Wells Fargo asserts that in light of the evidence supporting its reason for not promoting her and for hiring Chambers instead, Plaintiff cannot show she would have been promoted but for her complaints.  (Id. at 19.)

Wells Fargo again reasserts that on at least five separate occasions prior to Plaintiff's reporting of the "skirt" comment, Scott counseled Plaintiff regarding her need to improve her interpersonal skills before she could expect to be promoted:

November 2009: In their one-on-one meeting, Scott advised [Plaintiff] to "focus building rapport with your peers."

December 2009: Performance Evaluation: Scott wrote: "Focus on interacting and engaging in a positive manner at all times.  Your delivery style will be key [sic] component in your success in 2010.

April 20, 2010:  In their one-on-one meeting, Scott advised [Plaintiff] that her "demeanor needed polishing," and suggested taking management courses and reading Managing Upward (a book about developing positive working relationships).

28

April 20, 2010: Also in their one-on-one meeting, Scott advised [Plaintiff] that she needed to focus on "Department Engagement (perception): Positive interaction/communication style (always know your audience)."

April 28, 2010: After a Branch Manager made a complaint regarding [Plaintiff's] conduct toward him, Scott counseled [Plaintiff] that she "came across too firm/strong . . . when it was not necessary."

May 4, 2010: In their one-on-one meeting, Scott advised [Plaintiff] that "to ensure our expectations are clear as it relates to your interaction with our borrowers, 3rd party agents, team members, etc.  We are expected to represent Wells Fargo in a professional and respectful manner at all times.  It is unacceptable to be rude when handling borrowers, team members, 3rd Party, etc.  We have zero tolerance for rude, condescending or disrespectful interactions when representing Wells Fargo and servicing calls."

May 24, 2010: A customer contacted a manager in [Plaintiff's] department, Elizabeth Aleman, to make a complaint regarding [Plaintiff's] rude treatment of her.  Aleman counseled [Plaintiff] that this was unacceptable.[4]

(Mot. at 17–18 (emphases added).)

Wells Fargo argues that these instances demonstrate that Plaintiff

cannot show a causal connection between the complaints regarding Scott (which

did not occur until May 24, 2010) and Scott's decision not to promote her.  (Mot.

at 18.)  Moreover, on June 2, 2010, after Plaintiff reported the "skirt" comment to

Scott's supervisor and before Chambers was ultimately selected for the posted

---

[4] On May 25, 2010, Aleman emailed Scott to notify her about the "escalated call recap" she had with Plaintiff.  In the email Aleman told Scott that "[Plaintiff] discussed how she is working on correcting this type of behavior and that we should not hear any further calls from her that get elevated."  (Mot. Ex. B-8.)

position, Scott emailed Plaintiff following a meeting and wrote to Plaintiff

regarding her interest in a promotion to Supervisor II:

> Discussed providing open honest feedback to peers; One stop
> resolution with peers.
> Suggest completed Coaching for Premiere Performance and
> Crucial Conversation WF training classes <u>to improve
> communication/coaching style.</u>
> <u>Continue focusing on your communication style with our
> borrowers/customer to ensure your action plan to improve provides
> results</u>.

(<u>Id.</u> Ex. B-9 (emphases added).).

       Plaintiff responds that Scott's own actions are evidence of retaliation

because, prior to the "skirt" comment and Plaintiff's subsequent complaint, Scott

told Plaintiff that she could expect to be promoted in two to three months.[5]  (Resp.

at 13.)  Plaintiff asserts that after she reported the comment, Scott's "tune

completely changed,"[6] and Plaintiff was given "newly developed criteria" that

would stall her promotion for at least a year.  (<u>Id.</u>)  This change in her "tune,"

Plaintiff asserts, evidences retaliation.  In support, Plaintiff points the Court to

(1) an email from Scott to Plaintiff sent on November 5, 2009 (nearly six months

---

[5] The alleged "skirt" comment occurred on April 28, 2010, (FAC ¶ 8) and on May
24, 2010, Plaintiff met with Foxx, Scott's supervisor, to discuss the comments.
(FAC ¶ 10.)

[6] Although Plaintiff asserts that Scott's "tune completely changed" after Plaintiff
reported Scott's comments in May 2010, she also alleges in her complaint that as
late as August 2010 Scott informed her that she could expect a promotion
sometime in September.  (FAC ¶ 12.)

before the skirt comment) in which Scott listed "motivate/inspire people" as one of Plaintiff's strengths, and (2) a March 2010 "WOW Award" (approximately two months before the skirt comment) where Plaintiff was "named a 'WOW Winner' by Scott."  (Resp. at 6.)

      Although Plaintiff asserts that Scott's "tune completely changed" after she reported the incident, the evidence she presents does not raise a genuine issue of material fact as to retaliation.  Gollas, 425 F' Appx. at 327 (requiring that in order to survive summary judgment on the "but for" causation standard a plaintiff to demonstrate "a conflict in substantial evidence on the ultimate issue of retaliation").  The evidence demonstrates that Scott did not personally name Plaintiff a "WOW Winner."  Rather, a co-worker nominated Plaintiff for a "WOW Award" "for being Supportive; always available when I need her.  She provides outstanding support and encouragement.  I have learned so much from here [sic] in a short amount of time."  (Resp. Ex. I-7.)  Scott, as the manager of the team, distributed the "WOW Awards" email amongst her team (which included several other WOW awards to other team members), but Plaintiff was not "named a 'WOW Winner' by Scott" as Plaintiff asserts in her Response.  (Id. at 6.) Accordingly, the fact that Plaintiff was nominated a WOW Winner in March 2010 by a co-worker and the email listing those Winners was distributed by her

31

manager, Scott, does nothing to create a genuine issue of material fact as to Scott's "tune completely chang[ing]."

Additionally, the November 2009 email in which Scott listed "motivate/inspire people" as one of Plaintiff's strengths was sent only two months after Plaintiff began working under Scott's management.  The evidence presented by Wells Fargo demonstrates Plaintiff was counseled by Scott regarding her need to improve her interpersonal skills multiple times after that email was sent.

In sum, although Plaintiff alleges that in April 2010 Scott told her she should expect to be promoted in two to three months, the summary judgment evidence presented by Wells Fargo shows that Plaintiff's management perceived there was an issue with Plaintiff's interpersonal/communication skills both prior to and after her reporting the comment; the documents attached by Wells Fargo demonstrate five instances following Scott's November 2009 "motivate/inspire people" email and prior to the skirt comment in which Plaintiff's communication style was addressed—including two complaints during that time frame from a customer and a branch manager.

Based on the foregoing, the Court concludes Plaintiff has failed to demonstrate "a conflict in substantial evidence on the ultimate issue of retaliation" to meet the "but for" causation standard—that she would have been promoted but

for her complaint against Scott.  <u>See</u> <u>Gollas</u>, 425 F' Appx. at 327; <u>Septimus</u>, 399

F.3d at 608.

        B.     <u>Retaliation by Trombley</u>

        Plaintiff asserts that Trombley, the manager she was transferred to

after she left Scott's department, retaliated against her for reporting Scott's

comments by filling out an Internal Applicant Employment Reference Form and

indicating that he would not rehire her if she left the department.  (Resp. at 13.)

She asserts Trombley's actions effectively prevented her from ever obtaining a

promotion.  Plaintiff does not provide any explanation as to why Trombley would

retaliate against her for reporting Scott's comments other than that her "claims are

that Wells Fargo, through its agents, including Ms. Scott and Mr. Trombley,

retaliated against her after she took part in a protected activity."  (<u>Id.</u> at 13–14.)

        Plaintiff essentially argues that Trombley's indication on the Internal

Applicant Employment Reference Form must have been retaliatory in nature

because her "peers and team members continued to recognize her achievements

and her skills as a Supervisor;" therefore, Plaintiff asserts, the "stark difference" in

her team members' evaluations of her and Trombley's indication that he would not

re-hire her "clearly show a genuine issue of fact."  (Resp. at 13.)

        Plaintiff attached as exhibits multiple examples of the "positive

feedback" that she received during her employment.  (Resp. Ex. I.)  However, with

33

the exception of one "Thank You" "eCard" from Scott given October 12, 2009,

(only one month after Plaintiff began working under Scott's management), and an

email from Scott thanking Plaintiff for taking an escalated call, none of the positive

feedback examples are from Plaintiff's managers.  Rather, the vast majority of the

examples are from other team members thanking Plaintiff for taking escalated

calls.  (See id. Ex. I.)  Indeed, Trombley, in the same Internal Reference Form that

he indicated he would not rehire her if she left the department, also acknowledged

Plaintiff's expertise in taking escalated calls, stating:

> [Plaintiff's] most significant strength is her attention to detail.  She
> has brought issues for correction and attention on more than one
> occasion.  [Plaintiff] is very good at inspecting procedures and
> following policy.  [Plaintiff] has received several notes and
> compliments from agents stremming [sic] from her willingness to take
> escalated calls and tackle issues.  [Plaintiff] is also a supervisor who
> works e[x]tremely hard.  Though she works a shift which gives her
> afternoon's [sic] off, she is routinely present for afternoon meetings
> and special projects.

> However, Trombley also acknowledged her areas from improvement:

> [Plaintiff] needs improvement in her communication and peer
> interpersonal skills.  [Plaintiff] has difficulty in dealing with her peer
> group at times.  She has refused to attempt to resolve conflict with
> some members of her peer group, and this has hindered the team's
> effectiveness.  [Plaintiff's] communication style is very direct and
> formal, and this has led to problems being understood.  She has
> received two complaints regarding her communication style with
> internal team members in the past year and in both cases her
> communication choices led to the elevated situation.

(Mot. Ex. D-4 (emphasis added).)  Additionally, in the Internal Reference

Form, Trombley indicated that Plaintiff "does not meet" expectations in the

following categories: (1) "Stability and maturity, willingness to admit

mistakes and absence of issues that might interfere with the job," and

(2) "People skills . . . ability to get along with peers, clients, cooperativeness,

assertiveness, willingness to take direction, and empathy."  (Id.)  In the

"Managerial abilities" section, Trombley noted that "[Plaintiff] is very good

in holding team members accountable for clear cut performance issues.

[Plaintiff] has struggled at times with her peer team and helping to foster a

good team environment with them."  (Id.)   In the "Final Comments"

section, Trombley indicated that "[P]laintiff is a smart and talented

supervisor.  She has areas of significant strength but also areas where she

struggles and hinders the performance of the group as a whole.  [Plaintiff's]

areas for improvement also hinder her ability to lead members of her peer

group effectivly [sic]."  (Id.)

    Based on the foregoing, the evidence Plaintiff has presented that she

argues shows a "stark difference" in her team members' evaluations of her and

Trombley's, and therefore demonstrates pretext, does nothing more than reiterate

what Trombley himself indicated in the Internal Reference Form.  While Plaintiff

indeed had significant strengths in her performance, she had "struggles" with her

communication style which hindered her ability to lead members of her peer group effectively and also resulted in "two complaints regarding her communication style with internal team members in the past year." (See Ex. D-4.) Plaintiff has failed to put forth legally sufficient summary judgment evidence that Trombley would not have indicated he would not re-hire her on the Internal Reference Form but for her complaint against Scott. See Strong, 482 F.3d at 806.

III.   Constructive Discharge Claim

Under Title VII, a resignation is actionable only where that resignation amounts to a constructive discharge. Robinson v. Waste Mgmt. of Tex., 122 F. App'x 756, 758 (5th Cir. 2004). A plaintiff may prove a claim for constructive discharge after resigning from an employer if the plaintiff establishes "that working conditions were so intolerable that a reasonable employee would feel compelled to resign." Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001). Demonstrating constructive discharge imposes a high burden. Robinson, 122 F. App'x at 758. Constructive discharge occurs only "when the employer *deliberately* makes an employee's working conditions so intolerable that the employee is *forced* into an involuntary resignation . . . ." Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987) (quoting Wilkins v. Univ. of Hous., 654 F.2d 388, 390 (5th Cir. 1981)).

In analyzing a constructive discharge claim, the court "examines the working environment as a whole, and, to find for the plaintiff, must conclude that the resignation was reasonable under all the circumstances." Robinson, 122 F. App'x at 758.  The subjective state of mind of the employee, however, is irrelevant.  Id.  The Fifth Circuit has identified seven factors to help determine whether a reasonable employee in the plaintiff's shoes would feel compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (7) offers of early retirement that would make the employee worse off regardless whether the offer is accepted."  Id. (citing Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994)).

Plaintiff only argues that the "badgering, harassment, or humiliation by the employer" factor applies to her case.  (Resp. at 14.)  She argues that the following actions constitute the "badgering, harassment, or humiliation" by Wells Fargo: (1) Trombley's Internal Reference Form in which he indicated he would not re-hire her, (2) an anonymous call to the Ethics Line alleging that Plaintiff called Scott a racial slur, and (3) an incident in which a co-worker "became concerned" with Plaintiff's employment status in response to a comment made by Scott.  (Id.)

Plaintiff argues that Trombley's indication on the Internal Reference Form that he would not re-hire her "effectively closed off any type of promotion." (cite.)  However, "[n]umerous cases in [the Fifth] circuit have held that even repeated denials of promotions do not, in and of themselves, demonstrate that a reasonable employee would feel compelled to resign."  Robinson, 122 F. App'x at 759.

Plaintiff also asserts that because there was no investigation in to whether Plaintiff actually called Scott a racial slur, it is evidence that "nobody took it as a true complaint," presumably arguing that a false anonymous complaint was made against her.  (Resp. at 14.)  Additionally, Plaintiff asserts that the incident where her co-worker became concerned about Plaintiff's employment status with the company after hearing comments made by Scott evidences her "great distress." Plaintiff argues that the co-workers concerns were "quickly dismissed as insignificant," presumably arguing that the failure to investigate her concerns indicates an environment against her in which she was forced to resign.

In sum, Plaintiff argues, "[c]onsidering the cumulative nature of not being promoted after being promised and lead [sic] to believe a promotion was imminent, the increased arbitrary critiques of [Plaintiff] by management culminating in Trombley saying that he would not rehire her, and these two

incidents, it is not a stretch of the imagination that these actions were calculated to encourage Chapa's resignation."   (Resp. at 15.)

In <u>Harvixx v. Westward Comm., L.L.C.</u>, 433 F.3d 428 (5th Cir. 2005), the Fifth Circuit affirmed the district court's dismissal of a plaintiff's constructive discharge claim.  The Court held that the plaintiff's allegations that she was treated rudely with general hatefulness, a man she did not know began taking pictures of her, a meritless racial harassment charge was brought against her, and she heard a new supervisor state he would receive a bonus if he ran her off, even accepted as true, did not render the alleged harassment "so intolerable that a reasonable employee would feel compelled to resign."  <u>Id.</u> at 440.

Similarly, even assuming the truth of all of Plaintiff's allegations, Plaintiff fails to meet the high burden that Wells Fargo *deliberately* made Plaintiff's working conditions so intolerable that the she was *forced* into an involuntary resignation.  <u>Dornhecker</u>, 828 F.2d at 310.  Assuming the truth of Plaintiff's allegations, the Court cannot "conclude that the resignation was reasonable under all the circumstances."  <u>Robinson</u>, 122 F. App'x at 758 (citing <u>Barrow</u>, 10 F.3d 292, 297).  Accordingly, the Court dismisses Plaintiff's Title VII constructive discharge claim.

<u>CONCLUSION</u>

For the reasons given, the Court hereby **GRANTS** Wells Fargo's

Motion for Summary Judgment.  (Dkt. # 48.)

IT IS SO ORDERED.

DATED:  San Antonio, Texas, February 20, 2014.

_____

David Alan Ezra
Senior United States Distict Judge